MICHELLE (MINJU) Y. CHO (SBN 321939)
mcho@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

ASEEM MEHTA (SBN 338020)
aseemm@advancingjustice-alc.org
JINGNI (JENNY) ZHAO (SBN 284684)
jennyz@advancingjustice-alc.org
ASIAN AMERICANS ADVANCING
JUSTICE – ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

*Attorneys for Plaintiffs*
Additional Counsel Listed On Next Page

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MILTON MENDEZ; GUILLERMO MEDINA REYES; CRUZ LEANDRO MARTINEZ LEIVA; R.H.M.; E.O.A.R.; and all those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement; MOISES BECERRA, Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; THE GEO GROUP, INC.; NORBAL VAZQUEZ, Facility Administrator of Mesa Verde ICE Processing Center; MINGA WOFFORD, Facility Administrator of Golden State Annex, <br><br> Defendants. | Case No. 3:23-cv-00829 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **CLASS ACTION** |

1

BREE BERNWANGER (SBN 331731)
bbernwanger@lccrsf.org
LEE ANN FELDER-HEIM (SBN 341429)
lafelderheim@lccrsf.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444
Facsimile: (415) 543-0296

ROXANA MOUSSAVIAN (SBN 329897)
roxana@pangealegal.org
ETAN NEWMAN (SBN 308728)
etan@pangealegal.org
PANGEA LEGAL SERVICES
391 Sutter Street, Suite 500
San Francisco, CA 94108
Telephone: (415) 579-4662
Facsimile: (415) 593-5335

MICHAEL KAUFMAN (SBN 254575)
mkaufman@aclusocal.org
MAYRA B. JOACHÍN (SBN 306065)
mjoachin@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W. 8th Street, Suite 200
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 915-0220

HONG-AN N. TRAN (SBN 267685)
atran@jenner.com
MEI H. LIU (SBN 318112)
mei.liu@jenner.com
MAURA E. SMYLES (DC BN 90006775)*
msmyles@jenner.com
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
Telephone: (628) 267-6800
Facsimile: (628) 267-6859

*Attorneys for Plaintiffs*
*Motion for Admission *Pro Hac Vice* Forthcoming

## INTRODUCTION

1.    This action concerns the fundamental and constitutionally-protected rights of people to peaceably speak out against mistreatment by the government and to petition the government for redress of their grievances. Plaintiffs Milton Mendez, Guillermo Medina Reyes, Cruz Leandro Martinez Leiva, R.H.M., E.O.A.R. ("Named Plaintiffs"), and the class they seek to represent (collectively, "Plaintiffs"), have been exercising their First Amendment rights through a peaceful hunger strike while civilly detained by U.S. Immigration and Customs Enforcement ("ICE") and the GEO Group, Inc. ("GEO"), a private, for-profit prison company (collectively, "Defendants"). Defendants have retaliated against Plaintiffs—including by threatening, intimidating, and taunting them; restricting law library access, visitation, church, and yard time; denying them access to essential hygiene products; and deliberately making the physical conditions of confinement uncomfortable—with the purpose of chilling their peaceful, First-Amendment-protected protest.

2.    Plaintiffs are approximately 82 persons detained in ICE custody at Mesa Verde ICE Processing Center ("Mesa Verde") and Golden State Annex ("Golden State") who began their hunger strike on February 17, 2023. GEO owns and operates both Mesa Verde and Golden State pursuant to a contract with ICE. The expressed purpose of the hunger strike is to demand release from immigration custody and, if release is denied, to demand improved conditions and treatment from ICE and GEO.

3.    The collective hunger strike follows years of peaceful advocacy by individuals detained at Mesa Verde and Golden State to demand better treatment. That peaceful advocacy has included previous hunger strikes, the filing of grievances, the filing of administrative complaints with Department of Homeland Security oversight bodies, and contributions to a report concerning sub-standard food at these facilities. That peaceful advocacy also includes a ten-month-long, ongoing refusal by some detained individuals at Mesa Verde and Golden State to participate in Defendants' supposedly "voluntary" work program, under which ICE and GEO rely on detained individuals to provide cleaning and sanitation services to maintain detention facilities, for only USD $1.00 per day. Through this advocacy, detained individuals have demanded improved labor and detention conditions, including, among other things, payment in accordance with California's minimum wage laws, proper cleaning supplies and safety equipment, prompt medical attention,

fresh and healthy food, adequate clothing and footwear, and to be treated by Defendants with respect and dignity.

4.      Defendants have refused to address any of these demands. Instead, Defendants have engaged in a pattern or practice of retaliating against the Plaintiffs when they peacefully express their request for improved conditions and treatment.

5.      Since the hunger strike began, Defendants have denied or restricted Plaintiffs' access to the law library, family visitation, church, yard time, and recreational activities. Defendants have also engaged in a pattern of harassment against Plaintiffs by threatening to place them in solitary confinement, taunting them, pressuring them to abandon their strike, making the temperature of the dorms uncomfortably cold, depriving Plaintiffs of essential non-food commissary items (such as hygiene products), and leaving food on Plaintiffs' beds for extended periods of time even after they have expressly declined the food and requested that it be removed.

6.      Defendants' present conduct is consistent with their pattern or practice of retaliating against individuals detained at Mesa Verde and Golden State when those individuals voice concerns and file complaints or grievances. Throughout approximately the last three years, Defendants have repeatedly engaged in similar retaliation in response to peaceful First-Amendment-protected expression by detained individuals in these facilities. For example, Defendants have placed such individuals in solitary confinement for pretextual reasons, subjected them to pretextual and sexually abusive pat-downs, ordered them to stop filing grievances, confiscated hygiene supplies and medically necessary items, withheld access to commissary, filed false write-ups, and attempted to transfer at least one person to an out-of-state facility.

7.      Defendants' current retaliatory actions against Plaintiffs place pressure on Plaintiffs to terminate their peaceful and expressive hunger strike. Plaintiffs fear that Defendants will continue to unlawfully retaliate against them unless they succumb to Defendants' pressure to end the hunger strike.

8.      Defendants' retaliatory actions go far beyond the measures that would be necessary to accomplish legitimate institutional goals. Instead, Defendants' actions are intended to punish individuals for their peaceful protest and chill First Amendment-protected expression.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. §§ 2201–02 (declaratory relief).

10.      Venue is proper as to ICE and its officers under 28 U.S.C. § 1391(e)(1) because ICE is an agency of the United States and ICE officers are sued in their official capacity; and (1) at least one Defendant resides in this district; (2) at least one Plaintiff resides in this district; and/or (3) a substantial part of the events or omissions giving rise to the claims occurred in this district.

11.      Venue is proper as to GEO and its employees under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this district and, for venue purposes, GEO resides in this district because it is subject to this Court's personal jurisdiction.

## DIVISIONAL ASSIGNMENT

12.      Pursuant to Civil L. R. 3-2(c), this case is properly assigned to the San Francisco Division of this Court because a substantial part of the events or omissions giving rise to the claims occurred in the City and County of San Francisco.

## PARTIES

**A.      Plaintiffs**

13.      **Milton Mendez** is a 35-year-old resident of Sonoma County, California. Mr. Mendez has been detained by ICE and GEO at Mesa Verde for over 10 months, and is currently housed in Dorm C of the facility. Mr. Mendez has lived in the United States since 1999, previously held Temporary Protected Status, and lived in Sonoma County, California for 10 years prior to being detained. Mr. Mendez has been on hunger strike in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde since February 17, 2023. He has experienced retaliation by ICE and GEO since he declared his participation in the hunger strike.

14.      **Guillermo Medina Reyes** is 28 years old. He has been detained by ICE and GEO at Golden State for 26 months, and is currently housed in Dorm A4 of the facility. Mr. Medina Reyes has lived in the United States for over 20 years and lived in Santa Clara County, California for over 9 years prior to being detained. He intends to return to and reside in Santa Clara County when he is released from ICE custody. Mr.

Medina Reyes has been on hunger strike in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde since February 17, 2023. He has experienced retaliation by ICE and GEO since he declared his participation in the hunger strike.

15. **Cruz Leandro Martinez Leiva** is a 22-year-old resident of Houston, Texas. Mr. Martinez Leiva has been detained by ICE and GEO at Golden State for over 17 months, and is currently housed in Dorm A1 of the facility. Mr. Martinez Leiva has lived in the United States since 2015. He has been on hunger strike in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde since February 17, 2023. He has experienced retaliation by ICE and GEO since he declared his participation in the hunger strike.

16. **R.H.M.** is a 25-year-old resident of Monterey County, California. R.H.M. has been detained by ICE and GEO at Mesa Verde for over 15 months and is currently housed in Dorm C of the facility. R.H.M. has lived in the United States since 2006 and lived in Monterey County, California for 12 years prior to being detained. He intends to return to and reside in Monterey County when he is released from ICE custody. R.H.M. has been on hunger strike in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde since February 17, 2023. He has experienced retaliation by ICE and GEO since he declared his participation in the hunger strike.

17. **E.O.A.R.** is a 35-year-old resident of Sonoma County, California. E.O.A.R. has been detained by ICE and GEO at Golden State for over 17 months, and is currently housed in Dorm A4 of the facility. E.O.A.R. has lived in the United States for over 20 years, obtained lawful permanent resident status in 2016, and was granted protection from removal under the Convention Against Torture by an immigration judge on February 9, 2023. Prior to being detained, E.O.A.R. lived in Sonoma County, California for over 10 years. He intends to return to and reside in Sonoma County when he is released from ICE custody. E.O.A.R. has been on hunger strike in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde since February 17, 2023. He has experienced retaliation by ICE and GEO since he declared his participation in the hunger strike.

**B.    Defendants**

18.    Defendant Immigration and Customs Enforcement is a federal law enforcement agency within

the Department of Homeland Security ("DHS"). ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system.

19.     Defendant Tae Johnson is the Acting Director of ICE. Defendant Johnson is responsible for ICE's policies, practices, and procedures, including those relating to the treatment of detained immigrants and their conditions of confinement. He is sued in his official capacity.

20.     Defendant Moises Becerra is the Field Office Director of the San Francisco ICE Field Office. He maintains his office in San Francisco, California, within this judicial district. The San Francisco Field Office is directly responsible for carrying out ICE's immigration detention operations at Mesa Verde and Golden State. He is sued in his official capacity.

21.     Defendant the GEO Group, Inc. is a private company that contracts with government entities to provide incarceration and detention facilities, corrections officers, and other detention-related services. Its headquarters are in Boca Raton, Florida. GEO owns and operates Mesa Verde and Golden State, and has a contract with ICE to detain immigrants at both facilities.

22.     Defendant Norbal Vazquez is a GEO employee and the Facility Administrator of Mesa Verde. He is sued in his official capacity.

23.     Defendant Minga Wofford is a GEO employee and the Facility Administrator of Golden State. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

**A.    Plaintiffs Have Declared A Peaceful Hunger Strike To Demand Release from Custody or Improved Treatment And Conditions**

24.     On February 17, 2023, approximately 82 persons detained in ICE custody in Mesa Verde and Golden State, including Named Plaintiffs, declared they were beginning a collective hunger strike as a form of peaceful protest against their prolonged detention, abhorrent conditions of confinement, and poor treatment. Examples of such conditions include being served expired food at mealtime, inadequate medical care, moldy showers, lack of access to hygienic clothes and footwear, a pattern of retaliation, and other conditions causing or exacerbating illnesses and injuries.

25.    Throughout February 16 and 17, Plaintiffs conveyed their message of protest by filing grievances to Defendants announcing their collective hunger strike and the purposes of their strike. They continue to convey their message of protest through their participation in the ongoing hunger strike, public statements, and grievances.

26.    The message and demands of the hunger strike have been publicly conveyed through media and reporting.[1] The hunger strikers have also asked outside organizations and individuals to amplify their message on social media and through a press conference. Those organizations and individuals have done so, including by convening a press conference in front of the San Francisco ICE Field Office on February 22.

27.    The ongoing hunger strike is preceded by a ten-month-long and ongoing refusal by detained individuals at Mesa Verde and Golden State to participate in ICE's supposedly "voluntary" work program, under which detained individuals provide janitorial and sanitation services to maintain the facilities where they are detained for the wage of USD $1.00 per day. Detained individuals chose to stop participating in the work program unless ICE and GEO agreed to provide them payment in accordance with California's minimum wage laws, proper cleaning supplies and safety equipment, prompt medical attention, fresh and healthy food, and adequate clothing and footwear.

28.    For the last ten months, Defendants have refused to engage with the detained individuals' demands for improved conditions and treatment. Instead, Defendants have engaged in a pattern or practice of repeatedly retaliating against detained individuals who file grievances regarding their treatment or request improved conditions, including by placing them in solitary confinement for pretextual reasons and consistently subjecting them to sexually abusive pat-downs.

29.    Plaintiffs commenced a collective, peaceful hunger strike to bring ICE and GEO's attention to their demands and to highlight the urgency of their plight.

---

[1] *See, e.g.*, Yesenia Amaro, *Hunger strike at 2 Central Valley CA immigration facilities*, Fresno Bee (Feb. 17, 2023), *available at* https://www.fresnobee.com/news/local/article272532678.html; Ishani Desai, *Nearly 100 Mesa Verde, Golden State Annex detainees launch hunger strike*, Bakersfield Californian (Feb. 17, 2023), *available at* https://www.bakersfield.com/news/nearly-100-mesa-verde-golden-state-annex-detainees-launch-hunger-strike/article_03ae529a-af3b-11ed-a4cb-f3a341464227.html; *Migrantes detenidos en California realizan huelga de hambre por malos tratos en los centros de reclusión*, Latin US (Feb. 18, 2023), *available at* https://latinus.us/2023/02/18/migrantes-detenidos-california-realizan-huelga-hambre-malos-tratos-centros-reclusion/.

**B.      Defendants Are Engaging In Unconstitutional Retaliation Against Plaintiffs' Peaceful Expressive Activity**

30.      In response to Plaintiffs' peaceful hunger strike to protest the conditions of their confinement and mistreatment, Defendants have engaged in unconstitutional retaliation, which continues to escalate.

31.      At Mesa Verde, on or about February 17, Lt. Morua, a GEO employee, announced to hunger strikers, all of whom are housed in Dorm C, that their dorm was now "a big RHU," or Restricted Housing Unit, and that everyone in the dorm would have their privileges suspended as if they were in RHU. Starting on or about February 18, Defendants suspended previously-available family visitation and revoked regularly-scheduled recreation time for Dorm C. [2] However, family visitation and recreation continue according to their regular schedules in other dorms. Defendants also canceled regularly-scheduled programs including church, movie night, and arts-and-crafts for Dorm C, while leaving such programs intact for other dorms. Starting on or about February 22, Defendants have denied Plaintiffs access to commissary, including essential hygiene items such as toothpaste, soap, and shampoo.

32.      At Mesa Verde, Defendants have also denied Plaintiffs access to the law library, on which many of them rely to adequately defend themselves in immigration court. Defendants have engaged in harassment against hunger strikers, including turning up the air conditioning to make it uncomfortably cold; placing trays of food on the beds of hunger strikers and leaving the trays there for an extended period even after the individual declines the food and asks that it removed; denying access to the barbershop; and attempting to manipulate hunger strikers to end their strike or give up their medical rights; and making mocking and harassing comments.

33.      At Golden State, Defendants have threatened to put those engaged in the hunger strike in solitary confinement; verbally harassed, taunted and threatened hunger strikers; and have attempted to manipulate hunger strikers into ending their strike. Defendants have also taken actions to make the living conditions for hunger strikers unbearable. On or about February 18, Defendants turned up the air conditioning to make the dorms housing hunger strikers uncomfortably cold. Then, on or about February 20, Defendants began ignoring essential maintenance requests from dorms housing Plaintiffs, leaving

---

[2] At both Mesa Verde and Golden State, staff schedule recreation and other programming on a dorm-by-dorm basis.

malfunctioning toilets and showers unfixed. Defendants have also interfered with Plaintiffs' ability to pursue their claims in immigration court. After Plaintiffs in Golden State declared their hunger strike, the law librarian, an employee of GEO, began showing up noticeably late to dorms housing hunger strikers, shortening the amount of time that individuals in those dorms are provided to conduct legal research for their immigration cases. Finally, on the morning of February 23, a GEO employee announced to at least one dorm that no hunger strikers would receive any hygiene items from commissary.

34.    Defendants' actions of suspending visitation, eliminating yard time and other recreational activities, refusing to issue non-food commissary items, controlling the temperature to make it uncomfortably cold, threatening placement in solitary confinement, and other retaliation and harassment would chill a person of ordinary firmness from continuing to engage in the protected activity of hunger striking.

35.    The timing of Defendants' actions, their stated opposition to and taunting statements about the hunger strike, and other evidence of Defendants' retaliatory motive establishes that they have taken these actions in direct reaction to the strike and are motivated by the desire to chill First Amendment-protected activity.

### *The Timing of Defendants' Actions Suggests Desire To Chill Plaintiffs' Expressive Actions*

36.    First, Defendants' retaliatory actions began almost immediately after Plaintiffs declared they were going on a hunger strike to protest the conditions of their confinement and mistreatment. On February 17, the day the hunger strike began, GEO employees did not allow individuals housed in Mesa Verde Dorm C, where nearly all of the detained individuals had declared a hunger strike, any yard time that day. That same day, facility staff turned up the air conditioning in Dorm C to an uncomfortably cold level. The next day, February 18, GEO again did not provide yard time at the expected time to Dorm C. When a member of the proposed class in Dorm C asked a GEO employee that day what time yard would be, the GEO employee responded, "You know you don't get no rec time, no visits, nothing of nothing." Individuals in Dorm C have not been allowed out into the yard for recreation since the hunger strike began. Before the hunger strike, they had received two hours of yard time twice a day, for a total of four hours of yard time per day. Yard time is the only time detained people at Mesa Verde are allowed to be outside in the sunlight and fresh air.

37.    On February 18, facility staff informed hunger strikers in Dorm C that the facility was canceling the dorm's weekly movie night, which otherwise took place every Friday or Saturday. Similarly, on or about February 18, Defendants indefinitely suspended access to church, the law library, the barbershop, and arts-and-crafts programming for Dorm C. Soon after, Defendants indefinitely suspended visitation with family and loved ones for everyone in Dorm C. Various GEO employees told Plaintiffs in Dorm C that ICE had ordered them to suspend yard, recreational opportunities, and visitation for their dorm because of their participation in the hunger strike. These activities and programming remain available to people housed in other dorms at Mesa Verde.

38.    Plaintiffs in Mesa Verde have filed grievances with GEO and ICE regarding the retaliatory conditions described above, *supra* ¶¶ 36–37. Defendants have "rejected" or failed to respond to virtually every grievance filed by Plaintiffs since the hunger strike has begun.

39.    At Golden State, Defendants have engaged in a steady and escalating course of retaliation since the hunger strike began. Starting almost immediately, Defendants began attempting to verbally dissuade Plaintiffs from participating in the hunger strike, alternately cajoling and intimidating them. On or about February 17, GEO staff threatened to place hunger strikers detained in Dorm A1 into the Special Management Unit's ("SMU") isolation cells so that they could "do [their] hunger strike there." Plaintiffs report being afraid to go to the medical unit for care because they fear they will be forcibly transferred to the SMU. GEO staff also began restricting the time that individuals in dorms housing hunger strikers are permitted to use tablets in their dorms, from all day to just four hours per day. Detained individuals rely on tablets to request medical attention and prescription medication, make commissary purchases, and have video calls with family. On or about February 18, Defendants began making the dorms housing hunger strikers uncomfortably cold. Then, on or about February 20, Defendants began ignoring maintenance requests from dorms housing hunger strikers, leaving toilets and showers unrepaired. Soon after, the law librarian began shortening the amount of time that individuals in those dorms are allowed to conduct legal research for their immigration cases.

40.    Plaintiffs in Golden State have filed grievances with GEO and ICE regarding some of the conditions described above. Upon information and belief, Defendants have failed to respond to any of them.

41.     Defendants' decisions to make the dorms very cold; suspend or restrict Plaintiffs' law library access, yard time, visitation, barbershop, and recreational opportunities; and attempt to compel Plaintiffs to end their hunger strike serve no legitimate purpose. Nor have Defendants articulated to Plaintiffs any purported justification for the adverse actions they have taken against the hunger strikers. Instead, Defendants' actions are intended to punish Plaintiffs for their participation in a protected activity.

### *Defendants Have Repeatedly Stated Their Opposition To Plaintiffs' Expressive Actions*

42.     Both GEO and ICE employees have expressed opposition to Plaintiffs' participation in the hunger strike and threatened or implied negative consequences if they continued their participation.

43.     On February 16, the evening before the hunger strike began, some Plaintiffs informed GEO staff at Mesa Verde of their intention to begin a hunger strike shortly. GEO staff threatened to send the "first person" who declared a hunger strike to the RHU, a form of solitary confinement.

44.     Also on February 16, several hunger strikers detained at Golden State showed a GEO employee a grievance they were filing and declared they would be starting a hunger strike. The GEO employee became upset and threatened to put them in the "hole" (solitary confinement) and take away commissary if they went on hunger strike. On February 17, the first day of the hunger strike, an ICE employee told Named Plaintiffs Guillermo Medina Reyes and E.O.A.R., as well as other Plaintiffs at Golden State, "You and your attorneys should do what you gotta do to get your money, but don't get burned," suggesting that detained individuals would ultimately pay a price for engaging in the hunger strike. The same ICE officer told Mr. Medina Reyes and E.O.A.R., "[The strike] is not going to go anywhere. You're wasting your time."

45.     GEO employees at Mesa Verde and Golden State have laughed at Plaintiffs, attempted to intimidate them into ending their strike, and taunted them with food, making comments like, "Doesn't that look good?" as they placed trays of food on the hunger strikers' beds. On or about February 18, GEO employee Sazu mocked members of the proposed class in Golden State by walking into the dorm and asking, "Has anyone gone home yet?", insinuating that the hunger strikers ought to give up. On or about February 19, GEO employee Anasola remarked to a group of hunger strikers in Golden State that they needed the strike because they needed to lose weight. On February 20, Named Plaintiff E.O.A.R. heard a GEO

employee at Golden State make fun of the hunger strikers' efforts by referencing a prior hunger strike at the facility which had lasted for three days and claiming they, too, would "fail," because "you guys don't even know how to do a hunger strike right." On or about February 21, E.O.A.R. heard a different GEO employee express disgust at the hunger strikers, saying, "You guys should have thought about this before coming here illegally."

46.     On or about February 21, ICE officers visited several dorms at Golden State housing members of the proposed class. They announced that they would search their dorms for any hidden food and return the following week to conduct another search. On the same day, Defendant Moises Becerra also visited members of the proposed class detained at Golden State. Defendant Becerra asked Plaintiffs why they were engaging in a hunger strike. Plaintiffs explained that through the hunger strike, they were expressing their desire for a fair opportunity to be individually considered for release from custody, as opposed to receiving automatic or blanket denials. Defendant Becerra responded that ICE has no control over releases, "so to be honest you guys are wasting your time." Defendant Becerra told Plaintiffs that if they wanted release they would have to talk to their attorneys and "get them to do their job." Plaintiffs felt that Defendant Becerra's words signaled his frustration with the hunger strike and were an explicit attempt to convince them to end the strike.

47.     Defendants have further expressed their opposition to Plaintiffs' peaceful protest by threatening and applying negative consequences. For example, Defendants have indefinitely denied access to all commissary items to individuals housed in Mesa Verde Dorm C, including essential non-food items such as soap, shampoo, toothpaste, floss, mouthwash, and batteries. Earlier this week, Plaintiffs in Mesa Verde placed commissary orders and expected to receive them on February 22. However, they did not receive their orders. On February 22 at approximately 6:25 p.m., facility staff told Plaintiffs in Dorm C that Facility Administrator Vazquez had issued an order than they were indefinitely forbidden from ordering anything from commissary, including non-food items such as essential hygiene products.

48.     Defendants' express opposition to Plaintiffs' participation in protected activity, and threats of punishment if they persist, is consistent with Defendants' past practice of engaging in retaliatory discipline against detained individuals for acting collectively, standing up for their rights, using the grievance

procedures available to them, and filing litigation to contest unlawful labor conditions at Mesa Verde and Golden State. *See infra* ¶¶ 55–63.

### There Is Ample Other Evidence Of Defendants' Retaliatory Motive

49.     Defendants have engaged in conduct to manipulate and intimidate the hunger strikers to influence or limit their participation in the hunger strike protest.

50.     Soon after Plaintiffs declared the beginning of the hunger strike, nurses at Mesa Verde, including Nurse Ford, entered Dorm C and asked hunger strikers to sign a document written in English and authorizing the facility to administer involuntary medical treatment, without explaining to hunger strikers what was contained in the document. Several Plaintiffs in Dorm C do not understand written English. One hunger striker, who lacks the ability to read or write in any language, signed the document without understanding its contents because Nurse Ford presented him the document and instructed him to sign it. When Named Plaintiffs Milton Mendez and R.H.M. became aware of the contents of the document, they began to review it with other Plaintiffs to help them make an informed choice about whether to sign it. When GEO employees saw Mr. Mendez and R.H.M. were reviewing the document with other hunger strikers, they threatened to conduct a full search of the dorm to confiscate any copies of the document that remained. GEO employees claimed that only people who had signed the document were entitled to look at it.

51.     Since February 16, medical staff at Mesa Verde have refused to provide medical treatment to the proposed class or check their vital signs—despite being required by ICE policy to do so—unless the hunger strikers agreed to leave Dorm C and go to a separate medical unit or RHU. Plaintiffs are afraid that if they leave Dorm C, Defendants will forcibly place them in solitary confinement. Although Plaintiffs have consented to waive their privacy rights and repeatedly requested that medical staff check their vital signs inside the dorm—something Defendants at Mesa Verde have done during previous times of emergency, including the beginning of the COVID-19 pandemic—Defendants have instead conditioned Plaintiffs' access to medical care on their agreement to leave Dorm C. If a Plaintiff does not agree to leave Dorm C for this purpose, they are marked as "refusing" medical attention.

52.     The experience of one proposed class member illustrates the validity of Plaintiffs' fear about leaving Dorm C. On February 22, a hunger striker at Mesa Verde who was previously diagnosed with

diabetes requested that medical staff check his vital signs. He also requested that the medical staff provide him with Ensure, a high-protein drink, to help sustain his health during the hunger strike. The medical staff stated they would only agree if he left Dorm C and went to the main medical office. When the proposed class member did so, GEO staff told him that if he wanted Ensure, they would take him to medical isolation, and attempted to place handcuffs on his wrists. The proposed class member was forced to lie down on the floor to avoid being placed into medical isolation. After about twenty minutes, he was finally returned to Dorm C without receiving Ensure.

53.     Dr. Baruiz, a medical provider in Mesa Verde, has informed certain Plaintiffs that ICE has prohibited any medical staff from providing Ensure to any of the hunger strikers, as a matter of policy. Separately, however, Dr. Baruiz also told certain Plaintiffs that if they agree to go into medical isolation or solitary confinement, she would prescribe them Ensure. On February 22 at approximately 1:30 p.m., following numerous grievances about the issue, GEO officers announced to Plaintiffs in Mesa Verde that they would provide hunger strikers two servings of Ensure per day. However, as of the morning of February 23, Defendants have yet to provide any hunger striker with a single serving of Ensure.

54.     As the hunger strike continues, GEO staff are selectively targeting Plaintiffs with threats of discipline and displaying increasing contempt for them. On February 22, at Golden State, GEO employee Sazu threatened to "write up" Named Plaintiff Cruz Martinez Leiva for an unspecified violation after Mr. Martinez Leiva asked another proposed class member to press on his back where he was experiencing a muscle spasm. Mr. Martinez Leiva had never previously been disciplined for such innocuous conduct. Also on February 22, at Mesa Verde, Facility Administrator Vazquez gave a speech to Dorm C in which he repeatedly told the proposed class members that they were "prisoners" and "property of ICE." As Facility Administrator Vazquez spoke these words, Chief of Security Shawn Beeman, who was also present, laughed.

**C.     Over The Last Few Years, Defendants Have Displayed An Unlawful Pattern Or Practice Of Retaliation Against Detained Individuals In Their Care**

55.     For at least approximately the last three years, individuals detained at Mesa Verde and Golden State have experienced repeated retaliation by the San Francisco ICE Field Office and GEO in response to First-Amendment-protected activity, including hunger strikes. These experiences are well documented in three complaints filed with DHS's Office for Civil Rights and Civil Liberties ("OCRCL"), demand letters

addressed to ICE officials at the San Francisco ICE Field Office, and numerous grievances filed at Mesa
Verde and Golden State.

56.     In spring 2020, as COVID-19 began to sweep through the country, dozens of people detained
at Mesa Verde began a hunger strike to protest the impossibility of social distancing inside the crowded
facility, the lack of adequate cleaning supplies and sanitation, and the continued intakes of new individuals
into the facility. The hunger strikers called for a remedy to these life-threatening conditions and the release of
medically vulnerable individuals. From spring to summer 2020, dozens of individuals in Mesa Verde
participated in five hunger strikes to call attention to their living conditions and ask for help. In response,
GEO staff retaliated against hunger strikers by, among other things, refusing to provide sanitation services in
the dorms, withholding access to commissary (including to hygiene products), cutting phone and tablet
access necessary to contact attorneys and loved ones, issuing mass disciplinary write-ups, confiscating
hygiene supplies and medically necessary items (including prescription medication and walking canes), and
revoking recreation time. In furtherance of its efforts to chill the expressive activity, one GEO employee
reportedly informed an individual participating in the hunger strike, "I don't know why you're starving
yourself when ICE doesn't care what happens to you." ICE policy requires that the Field Office Director be
notified "immediately" when anyone in ICE custody is on a hunger strike,[3] and that contractors like GEO
maintain a detailed record of all interactions with the person on strike and all communications regarding the
strike between GEO and ICE Field Office personnel.[4] The retaliation at Mesa Verde continued, apparently
with the San Francisco Field Office's knowledge and approval.

57.     On August 26, 2021, a group of individuals filed a complaint with DHS's OCRCL,
documenting repeated instances of retaliation by ICE and its contractors in five ICE detention facilities in
California, including Mesa Verde and Golden State.[5] As to Mesa Verde, the complainants reported that when
they filed grievances and spoke out about the conditions in the facility that made it impossible to keep
themselves safe during the onset of the COVID-19 pandemic, GEO staff retaliated against them in the ways
described above, *supra* ¶ 56. As to Golden State, the complainants reported that when they exercised their

---

[3] ICE 2011 Performance Based National Detention Standards ("PBNDS") § 4.2(II)(2), p. 255.
[4] *Id.* at § 4.2(II)(8), p. 255.
[5] *Available at* https://perma.cc/3M56-YA3Q.

right to file grievances about and speak up against unfair treatment and unacceptable conditions, GEO staff retaliated against them by placing them in disciplinary segregation, ordering them to stop filing grievances, filing false disciplinary write-ups against them, and deliberately depriving their dorms of medical rounds on which detained individuals relied to report urgent medical needs and ask medical-related questions.

58.     In April 2022, individuals detained at Mesa Verde and Golden State commenced their participation in First-Amendment-protected activity to protest their mistreatment and vindicate their civil rights by filing grievances with GEO and ICE, protesting the "voluntary" work program, and filing complaints with state and federal agencies regarding violations of labor law, detention standards, and the Prison Rape Elimination Act ("PREA"). *See supra* ¶¶ 27–28. In response to these protected activities, Defendants engaged in retaliatory conduct that would chill a person of ordinary firmness from continuing to engage in the protected activity, including by placing individuals in solitary confinement, subjecting them to sexually abusive pat-downs, summarily denying legitimate grievances, and using disciplinary processes in a pretextual manner. *See id.*

59.     In early August 2022, ICE officials from the San Francisco Field Office began preparations to transfer from Mesa Verde to an out-of-state facility one of the individuals who had refused to continue participating in Defendants' "voluntary" work program. At the time of the attempted transfer, this individual had been in solitary confinement for over one month, apparently with San Francisco Field Office approval, as ICE requires that facilities notify the Field Office Director of all segregation that has become prolonged, beginning at 14 days.[6] According to GEO's "Institution Disciplinary Panel Report," the sole basis for his solitary confinement was that he had dropped a form into the facility's "kite" box, which collects messages from detained individuals intended for facility staff. The Facility Administrator stated in a written message to this individual that his efforts to "stand up for [his] rights" would "not be tolerated." Shortly thereafter, an Assistant ICE Field Office Director informed this individual's immigration attorney that he would be transferred out of state the following day. Attorneys from the ACLU Foundation of Northern California and the ACLU Foundation of Southern California quickly sent a letter to ICE's San Francisco Field Office expressing concerns that such a transfer would be clearly retaliatory in violation of the individual's First

---

[6] *See* PBNDS § 2.12(V)(C)(1), p. 178. ICE policy also prohibits disciplinary segregation that exceeds 30 days except in "extraordinary circumstances." *Id.* § 2.12(V)(B)(1).

Amendment rights. Immediately after receiving this letter, ICE returned the individual—who had already departed Mesa Verde for the transfer—back to the facility.

60. On September 13, 2022, a group of individuals filed a new complaint with DHS's OCRCL, again describing a pattern of retaliation from GEO and ICE staff at Mesa Verde and Golden State.[7] As to Mesa Verde, the complainants reported that when they advocated for improved treatment and conditions, GEO staff retaliated against them by placing them in administrative segregation for days or weeks, once again with apparent San Francisco Field Office Director's approval, given ICE's requirements that facility staff communicate with the Field Office Director when subjecting someone in ICE custody to segregation.[8] They experienced significant declines in mental health during their solitary confinement, and at least one began experiencing thoughts of suicide. As to Golden State, the complainants reported that in response to their advocacy for improved treatment and conditions, GEO staff retaliated against them by issuing mass disciplinary write-ups for behavior that had not been an issue before they began refusing to participate in the "voluntary" work program, depriving them of commissary, placing them in solitary confinement, and threatening them with physical harm.

61. In November 2022, GEO placed into solitary confinement the same individual whom ICE's San Francisco Field Office had sought to transfer in early August 2022. According to the write-up, the basis for the disciplinary segregation was conduct that had taken place over two weeks earlier, and which at the time had not resulted in disciplinary action. But a few days after the detained individual filed a PREA complaint against a GEO employee, that employee's wife—a GEO employee herself—used the two-week-old conduct as a basis to punish the detained individual. Advocates sent another letter to ICE's San Francisco Field Office and GEO expressing concerns that the individual's ongoing solitary confinement was yet another violation of his First Amendment rights. Neither ICE's San Francisco Field Office nor GEO responded to the letter, but they released the individual from segregation the following day.

62. On January 17, 2023, a group of individuals at Mesa Verde filed yet another complaint with DHS's OCRCL, this time describing relentless retaliation in the form of retaliatory, sexually abusive pat-

---

[7] *Available at* https://perma.cc/EKE2-X9TA.
[8] *See* PBNDS §§ 2.12(V)(A)(2)(f), p. 176; 2.12(V)(C)(1), p. 178.

downs by GEO staff, [9] which the San Francisco Field Office has refused to address despite its immediate responsibility to address allegations of sexual abuse by its contractors.[10] Many of the complainants are survivors of childhood sexual abuse, and GEO employees' unnecessarily invasive and sexual pat-downs, involving rubbing, pinching, lingering touch, and unwanted commentary, caused them to experience flashbacks and symptoms of post-traumatic stress disorder. Even complainants who did not experience childhood sexual abuse experienced panic attacks and intrusive thoughts as they lined up for unavoidable pat-downs. They reported skipping meals and recreation to avoid being subjected to pat-downs or being in the vicinity of certain officers more likely to touch them inappropriately. These sexually abusive pat-downs are targeted at individuals who have refused to continue participating in ICE and GEO's "voluntary" work program, and have been accompanied by statements from GEO employees that the complainants are "troublemakers" and that all of their grievances would henceforth be marked as "unfounded"—a threat that GEO has carried out.

63.    In sum, for approximately the last three years, Defendants have perpetuated a pattern of retaliatory conduct that would chill a person of ordinary firmness from continuing to engage in activities protected under the First Amendment, including placing individuals in solitary confinement, subjecting them to sexually abusive pat-downs, summarily denying legitimate grievances, and using disciplinary processes in a pretextual manner.

64.    ICE's San Francisco Field Office is directly responsible for Defendants' pattern of deploying disciplinary processes in retaliation for First Amendment-protected activity. According to ICE policy, the San Francisco Field Office Director was required to review all of the disciplinary actions described above. PBNDS § 3.1(V)(A)(5), p. 216. Moreover, ICE policy expressly calls for disciplinary action against detained individuals for "[e]ngaging in or inciting a group demonstration," without regard to whether the activity is protected by the First Amendment (the "Group Demonstration Policy"). PBNDS § 3.1 Appendix 3.1.A, p. 225. In July 2022, two Plaintiffs were found to have violated the Group Demonstration Policy for

---

[9] *Available at* https://perma.cc/ZPE5-UDMJ.
[10] PBNDS §§ 2.11(V)(K)(2), p. 128 (upon allegation of abuse by facility employee, facility administrator must "promptly" report to Field Office Director, along with local law enforcement); 2.11(V)(M)(3), p. 140 (facility must notify Field Office Director of results of investigation into abuse allegation).

exercising First Amendment-protected rights, including using the facility's grievance process to complain of mistreatment. Both were punished with solitary confinement in the RHU.

### CLASS ALLEGATIONS

65.    Named Plaintiffs seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of: All individuals detained by ICE at the Mesa Verde and Golden State Annex facilities who have declared, or will declare, that they are on hunger strike.

66.    The proposed class satisfies Rule 23(a)(1) because it so numerous that joinder of all members is impracticable. Approximately 82 individuals have participated or are currently participating in the hunger strike at Mesa Verde and Golden State and thus fall within the class definition. More individuals may join the hunger strike and will therefore fall within the class.

67.    Joinder is also impracticable because proposed class members are detained and many are indigent, lack counsel, and/or have limited English proficiency, making it exceedingly difficult for them to bring individual litigation against Defendants.

68.    The proposed class satisfies Fed. R. Civ. P. 23(a)(2) because there are questions of law or fact common to the class, the answers to which will drive the resolution of the litigation. These questions include which legal standard applies to First Amendment retaliation claims brought by individuals detained in civil immigration custody, and whether Defendants have a pattern, practice, and/or policy of retaliating against individuals at Mesa Verde and Golden State who are peaceably exercising their First Amendment rights.

69.    The proposed class satisfies Fed. R. Civ. P. 23(a)(3) because the claims of the proposed class representatives are typical of the claims of the class. Each proposed class representative, like the rest of the class, is subject Defendants' pattern, practice, and policy of retaliating against hunger strikers peaceably exercising their First Amendment rights. Each seeks similar relief as the rest of the class.

70.    The proposed class satisfies Fed. R. Civ. P. 23(a)(4) because the proposed class representatives have committed to fairly and adequately protecting the interests of the class, and are aware of no conflicts that would preclude fair and adequate representation.

71.    In addition, proposed class counsel are highly qualified to serve as class counsel and collectively have extensive experience litigating class actions, immigration detention cases, and First

1  Amendment issues.

2      72.     Finally, the proposed class satisfies Fed. R. Civ. P. 23(b)(2). Defendants have acted on

3  grounds generally applicable to the class by carrying out a pattern, practice, and policy of retaliating against

4  individuals in their custody who participate in peaceful collective action, including the current hunger strike.

5  This pattern, practice, and policy is reflected in ICE's Group Demonstration Policy, which purports to

6  authorize disciplinary action for participating in peaceful collective action, and in Defendants' lengthy

7  history of retaliating and condoning retaliation in response to peaceful collective action. Injunctive and

8  declaratory relief is appropriate on a class-wide basis.

9                    **DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS**

10     73.     A justiciable controversy exists between Plaintiffs and Defendants.

11     74.     Plaintiffs will suffer irreparable injury if Defendants continue to retaliate against them in

12  violation of the First Amendment.

13     75.     Plaintiffs have no adequate remedy at law.

14                                **CLAIM FOR RELIEF**

15              **First Amendment Of The United States Constitution—Unlawful Retaliation**

16     76.     The foregoing allegations are realleged and incorporated herein.

17     77.     The First Amendment to the U.S. Constitution protects "the freedom of speech . . . and to

18  petition the Government for a redress of grievances." U.S. Const. amend. I. This constitutional protection

19  applies to individuals in civil immigration detention.

20     78.     Defendants' actions of retaliation against Plaintiffs for their peaceful expression and protest—

21  including threatening, intimidating, and taunting them; restricting law library access, visitation, church, and

22  yard time; denying them access to essential non-food commissary items; and deliberately making the

23  physical conditions of confinement uncomfortable—violate Plaintiffs' rights under the First Amendment.

24                                **PRAYER FOR RELIEF**

25      **WHEREFORE,** the Plaintiffs respectfully ask this Court to take jurisdiction over this actual

26  controversy and grant the following relief:

27     1.     Certify the class described above, *supra* ¶ 65;

28

2.      Declare that the actions and practices of Defendants as described above constitute violations of the First Amendment to the U.S. Constitution;

3.      Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs to the unlawful acts and omissions described herein, and issue an injunction ordering Defendants to refrain from engaging in retaliation against Plaintiffs, including retaliatory transfers to other facilities, in response to Plaintiffs' participation in a hunger strike as an exercise of their First Amendment right to speak and to petition the government for a redress of grievances;

4.      Award Plaintiffs reasonable attorneys' fees, costs, and other disbursements in this action permitted under the Equal Access to Justice Act, *as amended*, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

5.      Grant all other relief that this Court deems just and proper.


Respectfully submitted,

Dated: February 23, 2023                AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION OF NORTHERN CALIFORNIA

                                        /s/ *Michelle (Minju) Y. Cho*
                                        Michelle (Minju) Y. Cho

                                        *Attorneys for Plaintiffs*