MICHELLE (MINJU) Y. CHO (SBN 321939)
mcho@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

ASEEM MEHTA (SBN 338020)
aseemm@advancingjustice-alc.org
JINGNI (JENNY) ZHAO (SBN 284684)
jennyz@advancingjustice-alc.org
ASIAN AMERICANS ADVANCING
JUSTICE – ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

*Attorneys for Plaintiffs*
Additional Counsel Listed On Next Page

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MILTON MENDEZ; GUILLERMO MEDINA REYES; CRUZ LEANDRO MARTINEZ LEIVA; R.H.M.; E.O.A.R.; PEDRO FIGUEROA-PADILLA; JOSE RUBEN HERNANDEZ GOMEZ; RAYMUNDO NOE DOMINGUEZ VIDAL; ROBERTO CARLOS FRANCO GUARDADO; and all those similarly situated, <br><br>           Plaintiffs, <br><br>     v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement; MOISES BECERRA, Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; THE GEO GROUP, INC.; NORBAL VAZQUEZ, Facility Administrator of Mesa Verde ICE Processing Center; MINGA WOFFORD, Facility Administrator of Golden State Annex, <br><br>           Defendants. | Case No. 3:23-cv-00829-TLT <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **CLASS ACTION** <br><br> **Judge Trina L. Thompson** |

1

BREE BERNWANGER (SBN 331731)
bbernwanger@lccrsf.org
LEE ANN FELDER-HEIM (SBN 341429)
lafelderheim@lccrsf.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444
Facsimile: (415) 543-0296

ROXANA MOUSSAVIAN (SBN 329897)
roxana@pangealegal.org
ETAN NEWMAN (SBN 308728)
etan@pangealegal.org
PANGEA LEGAL SERVICES
391 Sutter Street, Suite 500
San Francisco, CA 94108
Telephone: (415) 579-4662
Facsimile: (415) 593-5335

MICHAEL KAUFMAN (SBN 254575)
mkaufman@aclusocal.org
MAYRA B. JOACHÍN (SBN 306065)
mjoachin@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W. 8th Street, Suite 200
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 915-0220

HONG-AN N. TRAN (SBN 267685)
atran@jenner.com
MEI H. LIU (SBN 318112)
mei.liu@jenner.com
MAURA E. SMYLES (DC BN 90006775)*
msmyles@jenner.com
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
Telephone: (628) 267-6800
Facsimile: (628) 267-6859

*Attorneys for Plaintiffs*
*Admitted *pro hac vice*

# INTRODUCTION

1.     This action concerns the fundamental and constitutionally-protected rights of people to peaceably speak out against mistreatment by the government and to petition the government for redress of their grievances. Plaintiffs Milton Mendez, Guillermo Medina Reyes, Cruz Leandro Martinez Leiva, R.H.M., E.O.A.R. ("Representative Plaintiffs"), and the class they seek to represent (collectively, "Plaintiffs"), have exercised their First Amendment rights through a peaceful hunger strike while civilly detained by U.S. Immigration and Customs Enforcement ("ICE") and the GEO Group, Inc. ("GEO"), a private, for-profit prison company (collectively, "Defendants"). Plaintiffs Pedro Figueroa-Padilla, Jose Ruben Hernandez Gomez, Raymundo Noe Dominguez Vidal, and Roberto Carlos Franco Guardado ("Individual Plaintiffs") are four members of the putative class who, on March 7, 2023, were transferred to an out-of-state facility in retaliation for their participation in the peaceful hunger strike.

2.     In response to the collective hunger strike, Defendants have retaliated against Plaintiffs, including by employing physical violence and excessive force against them; suddenly transferring four Plaintiffs without prior notice to their attorneys and against their will to an out-of-state ICE detention facility and threatening them with forced feeding; and cutting off Plaintiffs' access to attorney-client communication channels for hours at a time. Defendants have also retaliated, and continue to retaliate, against Plaintiffs by threatening, intimidating, and taunting them; restricting law library access, visitation, church, and yard time; denying access to essential hygiene products and other non-food commissary items; and deliberately altering the physical conditions of confinement to increase Plaintiffs' discomfort. Defendants have engaged in this retaliation with the purpose of chilling Plaintiffs' peaceful, First-Amendment-protected protest. Although Defendants ultimately execute their escalating retaliation on the ground at Mesa Verde and Golden State, the planning, development, coordination, and approval for Defendants' conduct occurs at the ICE Field Office located in San Francisco, California, where Defendant San Francisco ICE Field Officer Director Moses Becerra and his colleagues conduct detention operations in Mesa Verde and Golden State.

3.     Plaintiffs are approximately 82 persons detained in ICE custody at Mesa Verde ICE Processing Center ("Mesa Verde") and Golden State Annex ("Golden State") who began their hunger strike on February 17, 2023. GEO owns and operates both Mesa Verde and Golden State pursuant to a contract

with ICE. The expressed purpose of the hunger strike and associated expressive activity, including speech and filing grievances, is to demand release from immigration custody and, if release is denied, to demand improved conditions and treatment from ICE and GEO.

4. The collective hunger strike follows years of peaceful advocacy by individuals detained at Mesa Verde and Golden State to demand better treatment. That peaceful advocacy has included previous hunger strikes, the filing of grievances, the filing of administrative complaints with Department of Homeland Security oversight bodies, and contributions to a report concerning sub-standard food at these facilities. That peaceful advocacy also includes a ten-month-long, ongoing refusal by some detained individuals at Mesa Verde and Golden State to participate in Defendants' supposedly "voluntary" work program, under which ICE and GEO rely on detained individuals to provide cleaning and sanitation services to maintain detention facilities, for only USD $1.00 per day. They have filed a lawsuit alleging that these working conditions violate California law. Through this advocacy, detained individuals have demanded improved labor and detention conditions, including, among other things, payment in accordance with California's minimum wage laws, working conditions that are safe and healthy, and to be treated by Defendants with respect and dignity.

5. Defendants have refused to address any of these demands. Instead, Defendants have engaged in a pattern or practice of retaliating against the Plaintiffs when they peacefully express their request for improved conditions and treatment.

6. Since the hunger strike began, Defendants have vociferously expressed their opposition to Plaintiffs' expressive activity and denied or restricted Plaintiffs' access to the law library, family visitation, church, yard time, and recreational activities. Defendants have also engaged in a pattern of harassment against Plaintiffs by threatening to place them in solitary confinement, taunting them, pressuring them to abandon their strike, making the temperature of the dorms uncomfortably cold, and depriving Plaintiffs of essential non-food commissary items (such as hygiene products).

7. Defendants' conduct in reaction to the hunger strike is consistent with their pattern or practice of retaliating against individuals detained at Mesa Verde and Golden State when those individuals voice concerns and file complaints or grievances. Throughout at least the last three years, Defendants have

repeatedly engaged in similar retaliation in response to peaceful First-Amendment-protected expression by detained individuals in these facilities. For example, Defendants have placed such individuals in solitary confinement for pretextual reasons, subjected them to pretextual and sexually abusive pat-downs, ordered them to stop filing grievances, confiscated hygiene supplies and medically necessary items, withheld access to commissary, filed false write-ups, and attempted to transfer at least one person to an out-of-state facility.

8.      Defendants' past and ongoing retaliatory actions against Plaintiffs place pressure on Plaintiffs to terminate their peaceful and expressive hunger strike. Plaintiffs have been terrorized by Defendants' actions and fear that Defendants will continue to unlawfully retaliate against them unless they succumb to Defendants' pressure to end the hunger strike.

9.      Defendants' retaliatory actions go far beyond the measures that would be necessary to accomplish legitimate institutional goals. Instead, Defendants' actions are intended to punish individuals for their peaceful protest and chill First Amendment-protected expression.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. §§ 2201–02 (declaratory relief).

11.      Venue is proper as to ICE and its officers under 28 U.S.C. § 1391(e)(1) because ICE is an agency of the United States and ICE officers are sued in their official capacity; and (1) at least one Defendant resides in this district; (2) at least one Plaintiff resides in this district; and/or (3) a substantial part of the events or omissions giving rise to the claims occurred in this district. In particular, the San Francisco ICE Field Office, located at 630 Sansome Street, Room 590, San Francisco, CA 94111, is responsible for carrying out ICE's immigration detention operations at Mesa Verde and Golden State, both of which are located within what ICE describes as its "San Francisco Area of Responsibility."

12.      Venue is proper as to GEO and its employees under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. In particular, GEO must seek approval for relevant conduct from the San Francisco ICE Field Office. Venue is also proper because GEO resides in this district for venue purposes: it has had sufficient contacts in the Northern District of California such that it would be subject to personal jurisdiction in this district if it were a separate state.

1

**DIVISIONAL ASSIGNMENT**

2        13.      Pursuant to Civil L. R. 3-2(c), this case is properly assigned to the San Francisco Division of

3    this Court because a substantial part of the events or omissions giving rise to the claims occurred in the City

4    and County of San Francisco.

5

**PARTIES**

6    **A.      Representative Plaintiffs**

7        14.      **Milton Mendez** is 35 years old. Until his release on bond on March 7, 2023, Mr. Mendez was

8    detained by ICE and GEO at Mesa Verde for over 10 months, most recently in Dorm C of the facility. Mr.

9    Mendez has lived in the United States since 1999, previously held Temporary Protected Status, and lived in

10   Sonoma County, California for 10 years prior to being detained. Mr. Mendez began a hunger strike on

11   February 17, 2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden

12   State and Mesa Verde. He has experienced retaliation by ICE and GEO since declaring his participation in

13   the hunger strike.

14       15.      **Guillermo Medina Reyes** is 28 years old. He has been detained by ICE and GEO at Golden

15   State for 26 months, and is currently housed in Dorm A4 of the facility. Mr. Medina Reyes has lived in the

16   United States for over 20 years and lived in Santa Clara County, California for over 9 years prior to being

17   detained. He intends to return to and reside in Santa Clara County when he is released from ICE custody. Mr.

18   Medina Reyes began a hunger strike on February 17, 2023 in protest against Defendants' mistreatment and

19   the conditions of confinement at Golden State and Mesa Verde. He has experienced retaliation by ICE and

20   GEO since declaring his participation in the hunger strike.

21       16.      **Cruz Leandro Martinez Leiva** is 22 years old. Mr. Martinez Leiva has been detained by ICE

22   and GEO at Golden State for over 17 months, and is currently housed in Dorm A1 of the facility. Mr.

23   Martinez Leiva has lived in the United States since 2015. He began a hunger strike on February 17, 2023 in

24   protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde.

25   He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike.

26       17.      **R.H.M.** is a 25-year-old resident of Monterey County, California. R.H.M. has been detained

27   by ICE and GEO at Mesa Verde for over 15 months and is currently housed in Dorm C of the facility.

28

R.H.M. has lived in the United States since 2006 and lived in Monterey County, California for 12 years prior to being detained. He intends to return to and reside in Monterey County when he is released from ICE custody. R.H.M. began a hunger strike on February 17, 2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde. He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike.

18.   **E.O.A.R.** is a 35-year-old resident of Sonoma County, California. E.O.A.R. has been detained by ICE and GEO at Golden State for over 17 months, and is currently housed in Dorm A4 of the facility. E.O.A.R. has lived in the United States for over 20 years, obtained lawful permanent resident status in 2016, and was granted protection from removal under the Convention Against Torture by an immigration judge on February 9, 2023. Prior to being detained, E.O.A.R. lived in Sonoma County, California for over 10 years. He intends to return to and reside in Sonoma County when he is released from ICE custody. E.O.A.R. began a hunger strike on February 17, 2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde. He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike.

**B.   Individual Plaintiffs**

19.   **Pedro Figueroa-Padilla** is a 34-year-old resident of California. Until March 7, 2023, Mr. Figueroa-Padilla had been detained by ICE and GEO at Mesa Verde for over 15 months, most recently in Dorm C. Mr. Figueroa-Padilla has lived in the United States for over 33 years, is the father of four U.S. citizen children, and served as an inmate firefighter for two fire seasons prior to his detention by ICE. Mr. Figueroa-Padilla began a hunger strike on February 17, 2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde. He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike, including a retaliatory transfer from Mesa Verde to an ICE detention facility in El Paso, Texas, on March 7, 2023.

20.   **Jose Ruben Hernandez Gomez** is a 33-year-old resident of California. Until March 7, 2023, Mr. Hernandez Gomez had been detained by ICE and GEO for over 15 months, most recently at Mesa Verde in Dorm C. Mr. Hernandez Gomez has been a permanent resident of the United States for nearly 25 years and his entire family lives in the United States. Mr. Hernandez Gomez began a hunger strike on February 17,

2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde. He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike, including a retaliatory transfer from Mesa Verde to an ICE detention facility in El Paso, Texas, on March 7, 2023.

21.    **Raymundo Noe Dominguez Vidal** is 62 years old. Until March 7, 2023, he had been detained by ICE and GEO at Mesa Verde for over 9 months, most recently in Dorm C. Mr. Dominguez Vidal has lived in the United States for over 25 years. Mr. Dominguez Vidal began a hunger strike on February 17, 2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde. He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike, including a retaliatory transfer from Mesa Verde to an ICE detention facility in El Paso, Texas, on March 7, 2023.

22.    **Roberto Carlos Franco Guardado** is a 41-year-old resident of San Mateo County, California. Until March 7, 2023, Mr. Franco Guardado had been detained by ICE and GEO at Golden State and Mesa Verde for over 27 months, most recently at Mesa Verde in Dorm C. Mr. Franco Guardado has lived in the United States for over 15 years and is a father to three U.S. citizen children. Prior to being detained, Mr. Franco Guardado lived in San Mateo County for several years. He intends to return to and reside in San Mateo County when he is released from ICE custody. Mr. Franco Guardado began a hunger strike on February 17, 2023 in protest against Defendants' mistreatment and the conditions of confinement at Golden State and Mesa Verde since. He has experienced retaliation by ICE and GEO since declaring his participation in the hunger strike, including a retaliatory transfer from Mesa Verde to an ICE detention facility in El Paso, Texas, on March 7, 2023.

**C.    Defendants**

23.    Defendant Immigration and Customs Enforcement is a federal law enforcement agency within the Department of Homeland Security ("DHS"). ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system.

24.     Defendant Tae Johnson is the Acting Director of ICE. Defendant Johnson is responsible for ICE's policies, practices, and procedures, including those relating to the treatment of detained immigrants and their conditions of confinement. He is sued in his official capacity.

25.     Defendant Moises Becerra is the Field Office Director of the San Francisco ICE Field Office. He maintains his office in San Francisco, California, within this judicial district. The San Francisco ICE Field Office is directly responsible for carrying out ICE's immigration detention operations at Mesa Verde and Golden State. He is sued in his official capacity.

26.     Defendant the GEO Group, Inc. is a private company that contracts with government entities to provide incarceration and detention facilities, corrections officers, and other detention-related services. Its headquarters are in Boca Raton, Florida. GEO owns and operates Mesa Verde and Golden State, and has a contract with ICE to detain immigrants at both facilities.

27.     Defendant Norbal Vazquez is a GEO employee and the Facility Administrator of Mesa Verde. He is sued in his official capacity.

28.     Defendant Minga Wofford is a GEO employee and the Facility Administrator of Golden State. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

**A.      Plaintiffs Have Declared A Peaceful Hunger Strike To Demand Release from Custody or Improved Treatment And Conditions**

29.     On February 17, 2023, approximately 82 persons detained in ICE custody in Mesa Verde and Golden State, including Representative Plaintiffs, declared they were beginning a collective hunger strike as a form of peaceful protest against their prolonged detention, abhorrent conditions of confinement, and poor treatment. Examples of such conditions include being served expired food at mealtime, inadequate medical care, moldy showers, lack of access to hygienic clothes and footwear, a pattern of retaliation, and other conditions causing or exacerbating illnesses and injuries.

30.     Throughout February 16 and 17, Plaintiffs conveyed their message of protest by filing grievances to Defendants announcing their collective hunger strike and the purposes of their strike. They continue to convey their message of protest through their participation in the ongoing hunger strike, public statements, and grievances.

31.    The message and demands of the hunger strike have been publicly conveyed through media and reporting.[1] The hunger strikers have also asked outside organizations and individuals to amplify their message on social media and through a press conference. Those organizations and individuals have done so, including: by convening a press conference in front of the San Francisco ICE Field Office on February 22; a March 1 advocacy letter addressed to ICE Enforcement and Removal Operations leadership—including Defendant San Francisco ICE Field Office Director Becerra and San Francisco ICE Deputy Field Office Director Richard Chang—and signed by 111 legal service providers and immigrants' rights organizations; and a rally to support the hunger strikers in front of Golden State Annex on March 5.

32.    The ongoing hunger strike is preceded by a ten-month-long and ongoing refusal by detained individuals at Mesa Verde and Golden State to participate in ICE's supposedly "voluntary" work program, under which detained individuals provide janitorial and sanitation services to maintain the facilities where they are detained for the wage of USD $1.00 per day. Detained individuals chose to stop participating in the work program unless ICE and GEO agreed to provide them payment in accordance with California's minimum wage laws, proper cleaning supplies and safety equipment, prompt medical attention, fresh and healthy food, and adequate clothing and footwear.

33.    However, for the last ten months, Defendants have refused to engage with the detained individuals' demands for improved conditions and treatment. Defendants have instead engaged in a pattern or practice of repeatedly retaliating against detained individuals who file grievances regarding their treatment or request improved conditions, including by placing them in solitary confinement for pretextual reasons and consistently subjecting them to sexually abusive pat-downs.

34.    These sexually abusive pat-downs involve unnecessary rubbing, pinching, lingering touch, fondling of genitalia, and unwanted commentary by GEO officers toward detained individuals. For many

---

[1] *See, e.g.*, Yesenia Amaro, *Hunger strike at 2 Central Valley CA immigration facilities*, Fresno Bee (Feb. 17, 2023), *available at* https://www.fresnobee.com/news/local/article272532678.html; Ishani Desai, *Nearly 100 Mesa Verde, Golden State Annex detainees launch hunger strike*, Bakersfield Californian (Feb. 17, 2023), *available at* https://www.bakersfield.com/news/nearly-100-mesa-verde-golden-state-annex-detainees-launch-hunger-strike/article_03ae529a-af3b-11ed-a4cb-f3a341464227.html; *Migrantes detenidos en California realizan huelga de hambre por malos tratos en los centros de reclusión*, Latin US (Feb. 18, 2023), *available at* https://latinus.us/2023/02/18/migrantes-detenidos-california-realizan-huelga-hambre-malos-tratos-centros-reclusion/.

detained individuals who are survivors of childhood sexual abuse, these pat-downs cause them to experience flashbacks and symptoms of post-traumatic stress. Even those who did not experience childhood sexual abuse experienced panic attacks and intrusive thoughts as they lined up for unavoidable pat-downs, and reported skipping meals and recreation to avoid being subjected to pat-downs or being in the vicinity of certain officers more likely to touch them inappropriately. These sexually abusive pat-downs are targeted at detained individuals who have refused to continue participating in ICE and GEO's "voluntary" work program, and have been accompanied by statements from GEO employees that the complainants are "troublemakers" whose grievances would henceforth be marked as "unfounded"—a threat that GEO has carried out. The San Francisco ICE Field Office has refused to address these abusive pat-downs despite its immediate responsibility to address allegations of sexual abuse by its contractors.[2]

35.     The hunger strike is further preceded by at least three years of an unlawful pattern or practice of ICE and GEO's retaliation against detained individuals in their care who participate in First-Amendment-protected activity, including hunger strikes. These experiences are well documented in three complaints filed with DHS's Office for Civil Rights and Civil Liberties ("OCRCL"),[3] demand letters addressed to ICE officials at the San Francisco ICE Field Office, and numerous grievances filed at Mesa Verde and Golden State.

36.     Together, the complaints, letters, and grievances describe how, when confronted by peaceful First-Amendment-protected protest by individuals detained in immigration detention facilities including Mesa Verde and Golden State, ICE and GEO have repeatedly retaliated against such detained individuals in various ways, including: placing them in solitary confinement or administrative segregation for days or weeks,[4] subjecting them to sexually abusive pat-downs, threatening them with physical harm, ordering them

---

[2] PBNDS §§ 2.11(V)(K)(2), p. 128 (upon allegation of abuse by facility employee, facility administrator must "promptly" report to Field Office Director, along with local law enforcement); 2.11(V)(M)(3), p. 140 (facility must notify Field Office Director of results of investigation into abuse allegation).
[3] *See* Complaint to DHS OCRCL regarding First Amendment Retaliation (Aug. 26, 2021), *available at* https://perma.cc/3M56-YA3Q; Complaint to DHS OCRCL regarding retaliation at Mesa Verde and Golden State (Sept. 12, 2022), *available at* https://perma.cc/EKE2-X9TA; Complaint to DHS OCRCL regarding retaliatory and sexually abusive pat-downs at Mesa Verde (Jan. 17, 2023), *available at* https://perma.cc/ZPE5-UDMJ.
[4] ICE policy requires that facility staff communicate with the ICE Field Office Director when subjecting someone in ICE custody to segregation. *See* PBNDS §§ 2.12(V)(A)(2)(f), p. 176; 2.12(V)(C)(1), p. 178.

to stop filing grievances, summarily denying legitimate grievances, filing false disciplinary write-ups, issuing mass disciplinary write-ups, deliberately depriving their dorms of medical rounds during which detained individuals report urgent medical needs and ask medical-related questions, refusing to provide sanitation services to their dorms, cutting phone and tablet access necessary to contact attorneys and loved ones, withholding access to commissary (including to hygiene products), confiscating hygiene supplies and medically necessary items (including prescription medication and walking canes), and revoking yard time.

37.     In August 2022, ICE attempted to transfer at least one individual from Mesa Verde to an out-of-state facility on the sole basis that he had placed a grievance in the grievance box. After the ACLU Foundation of Northern California and the ACLU Foundation of Southern California sent the San Francisco ICE Field Office a demand letter expressing concerns that such a transfer would be clearly retaliatory in violation of the individual's First Amendment rights, ICE promptly returned the individual—who had already departed Mesa Verde for an impending transfer—back to the facility.

38.     In November 2022, GEO placed the same individual into disciplinary segregation for pretextual reasons. Advocates sent another letter to ICE's San Francisco Field Office and GEO expressing concerns that the individual's ongoing solitary confinement was yet another violation of his First Amendment rights. Neither ICE's San Francisco Field Office nor GEO responded to the letter, but they released the individual from segregation the following day.

39.     In sum, for at least the last three years, Defendants have perpetuated a pattern of retaliatory conduct that would chill a person of ordinary firmness from continuing to engage in activities protected under the First Amendment, including placing individuals in solitary confinement, subjecting them to sexually abusive pat-downs, summarily denying legitimate grievances, and using disciplinary processes in a pretextual manner.

40.     On February 17, 2023, Plaintiffs commenced a collective, peaceful hunger strike to bring ICE and GEO's attention to their demands and to highlight the urgency of their plight.

**B.     Defendants Are Engaging In Unconstitutional Retaliation Against Plaintiffs' Peaceful Expressive Activity**

41.     In response to Plaintiffs' peaceful hunger strike to protest the conditions of their confinement and mistreatment, Defendants have engaged in unconstitutional retaliation, which has escalated over time.

***Defendants Have Engaged In Systematic Retaliation Against Plaintiffs Since The Start Of Peaceful Protest At Mesa Verde And Golden State***

42.     Before violently escalating their retaliation on March 7, Defendants engaged in a coordinated campaign of retaliation against Plaintiffs in reaction to their peaceful, expressive hunger strike.

43.     At Golden State, since the hunger strike began, Defendants have laughed at and mocked Plaintiffs, threatened to put those engaged in the hunger strike in solitary confinement; verbally harassed, taunted and threatened hunger strikers; and have attempted to manipulate hunger strikers into ending their strike. Defendants have also taken actions to make the living conditions for hunger strikers unbearable. On or about February 18, Defendants turned up the air conditioning to make the dorms housing hunger strikers uncomfortably cold. Then, on or about February 20, Defendants began ignoring essential maintenance requests from dorms housing Plaintiffs, leaving malfunctioning toilets and showers unfixed.

44.     Defendants have also interfered with Plaintiffs' ability to pursue their claims in immigration court. After Plaintiffs in Golden State declared their hunger strike, the law librarian, an employee of GEO, began showing up noticeably late to dorms housing hunger strikers, shortening the amount of time that individuals in those dorms are provided to conduct legal research for their immigration cases. On the morning of February 23, a GEO employee announced to at least one dorm that no hunger strikers would receive any hygiene items from commissary.

45.     Over time, Defendants escalated their campaign of retaliation against Plaintiffs in Golden State. As the hunger strike entered its second week, Defendants canceled virtual attorney visits for Plaintiffs with no explanation, canceled or delayed yard time for Plaintiffs, and canceled family visits scheduled for Plaintiffs—while allowing visits or programs to continue unchanged for detained individuals who are not hunger striking.[5]

46.     Defendants have knowingly neglected the acute medical needs of at least one Plaintiff in Golden State. Around 2:30 a.m. on February 27, 2023, a Plaintiff in Golden State was severely shaking and very cold. Representative Plaintiff Leiva observed his distress and asked the medical staff to take the ill Plaintiff to see a doctor. Mr. Leiva requested that the ill individual be brought a wheelchair and taken to see a

---

[5] At both Golden State and Mesa Verde, staff schedule recreation and other programming on a dorm-by-dorm basis. The cancellations described herein include visits cancelled with individuals who reside in this district.

doctor. Defendants refused both requests. Instead, Defendants removed the ill Plaintiff from the dorm and placed him in a very cold waiting cell. After several hours without being able to see a doctor, the ill Plainitff asked to be taken to the hospital. Defendants refused. The ill Plaintiff then asked to be taken back to the dorm because he was so cold. A GEO officer told him that he would be called when a doctor arrived at 6 a.m. No one came to pick up the ill Plaintiff until about 2 p.m. During the eight hours he waited to meet a doctor, the ill Plaintiff was shaking in his bed, saying he was freezing cold.

47.    At Mesa Verde, Defendants have subjected Plaintiffs to continuous retaliation since the hunger strike began on February 17. Shortly after Plaintiffs in Mesa Verde informed Defendants they were commencing a hunger strike, GEO employee Lieutenant Morua announced to the hunger strikers—all of whom are housed in Dorm C—that their dorm was now "a big RHU," or Restricted Housing Unit, and that everyone in the dorm would have their privileges suspended as if they were in RHU. Starting on or about February 18, Defendants suspended previously-available family visitation and revoked regularly-scheduled yard time for Dorm C. Yard time, typically four hours per day, is the only time detained individuals at Mesa Verde have access to sunlight and fresh air. However, family visitation and yard time continued according to their regular schedules in other dorms. Defendants also canceled regularly-scheduled programs including church, movie night, and arts-and-crafts for Dorm C, while leaving such programs intact for other dorms. Starting on or about February 22, Defendants began denying Plaintiffs access to commissary, including essential hygiene items such as toothpaste, soap, and shampoo.

48.    Defendants have also denied Plaintiffs in Mesa Verde access to the law library, on which many of them rely to adequately defend themselves in immigration court. Defendants have engaged in harassment against hunger strikers, including turning up the air conditioning to make it uncomfortably cold; denying access to the barbershop; attempting to manipulate hunger strikers to end their strike or give up their medical rights; restricting their access to tablets Plaintiffs rely on to make medical requests and communicate with loved ones; and making mocking and harassing comments.

49.    Defendants have escalated their use of sexually abusive pat-downs against Plaintiffs in Mesa Verde. Since the strike began, Defendants' use of pat-downs has increased in frequency and intensity. For example, it was previously the case that pat-downs were not necessarily required for Plaintiffs to be escorted

from one secure area to another secure area of Mesa Verde. But since the hunger strike began, Plaintiffs have reported that pat-downs are mandatory to leave the dorm to go anywhere, including to participate in their own legal proceedings. For example, Defendants refused to permit Representative Plaintiff R.H.M. to meet with his counsel or attend a court hearing unless he subjected himself to sexually abusive pat-downs.

50.     On March 1, after this action was filed, Plaintiffs in Mesa Verde were informed through the tablet grievance system that as of that day, previously suspended privileges—including yard, access to the law library, recreation, movie nights, barbershop, and family visitation—would be restored to them. However, Defendants appear to have reneged on at least some of those representations. For example, on March 3, individuals in Mesa Verde Dorm C—even those no longer participating in the hunger strike—were told they would not be permitted to participate in an upcoming "pizza night" at the facility. Moreover, as of March 6, Plaintiffs' family visits had not been restored, though they continue for other individuals detained at Mesa Verde.[6] As of March 9, Plaintiffs in Dorm C continued to be denied access to commissary food items and drinks, even after pausing their hunger strike.

***Violent Escalation On March 7, 2023: ICE Officers Forcibly Transfer Four Plaintiffs Out Of Mesa Verde And Threaten Further Retaliatory Transfers***

51.     On March 7, ICE and GEO engaged in a planned, coordinated use of violence, excessive force, and terror against Plaintiffs in Mesa Verde Dorm C, where all the hunger strikers in Mesa Verde are detained. Ultimately, Defendants forcibly removed the four Individual Plaintiffs from the dorm and transferred them against their will and without prior notice to their attorneys in California to a detention center in El Paso, Texas. Defendants' actions left the remaining Plaintiffs in Dorm C in a state of shock, fear, and intimidation. Upon information and belief, the San Francisco ICE Field Office—in collaboration with GEO staff based in Mesa Verde—planned, coordinated, and approved its raid on Mesa Verde from its headquarters in San Francisco, where it oversees all detention operations at Mesa Verde and Golden State.

52.     Around 6:00 a.m. on March 7, 2023, multiple GEO officers entered Mesa Verde Dorm C wearing helmets and hard protective gear. They carried batons and pepper spray and obscured their faces. The officers cut off phone access in Dorm C, including for attorney calls; turned off all but two tablets; and

---

[6] On information and belief, no family member of a hunger striker has attempted to schedule a visit since March 6.

forcibly removed Individual Plaintiff Raymundo Noe Dominguez Vidal from the dorm. Despite their pleas, the armed officers refused to allow any of the Plaintiffs to call their attorneys or speak to ICE leadership. Mr. Dominguez Vidal later reported that after he was taken away, he started to feel dizzy and collapsed. When he couldn't get up in response to officers' orders, an ICE officer and GEO Officer Morales forcefully dragged him and eventually kicked him in the back several times—so hard that he continues to experience pain—in the presence of San Francisco ICE Assistant Field Office Director Manuel Starr.

53.     About two hours after Individual Plaintiff Dominguez Vidal was forcibly removed, more officers entered Mesa Verde Dorm C, wearing military-style clothing and gear, and also armed with batons and pepper spray. San Francisco ICE Assistant Field Office Director Manuel Starr accompanied them. The group included ICE officers, wearing badges stating "ICE" and "San Francisco Special Force Response Team," as well as more GEO officers in protective gear. They yelled at everyone to get on the floor and used bodily force to throw multiple Individual Plaintiffs to the ground and against a wall. The armed officers approached Individual Plaintiffs Roberto Carlos Franco Guardado, Jose Ruben Hernandez Gomez, and Pedro Figueroa-Padilla, grabbed them, forcefully handcuffed them, and removed them from the dorm. Multiple Plaintiffs witnessed Mr. Figueroa-Padilla crying out in pain and exclaiming that he was not resisting arrest as GEO officers swarmed him, piled on top of his body, and eventually handcuffed him. Multiple Plaintiffs further witnessed ICE officers throwing Mr. Hernandez Gomez on the ground, face down, and twisting his arms.

54.     When other Plaintiffs tried to use the unmonitored dormitory telephones used for legal calls to alert their attorneys to ICE and GEO's conduct, they realized that ICE and GEO had shut off their telephone access. Plaintiffs found two monitored tablets that were still working and contacted their counsel and families in alarm. Representative Plaintiff Milton Mendez managed to communicate with his fiancée, who passed word to his attorney. Mr. Mendez's attorney resides in this district. ICE and GEO re-connected telephone access within Dorm C around 11:00 a.m., well after the Individual Plaintiffs had been forcibly removed—and only after Plaintiffs' counsel emailed Defendants' counsel demanding an explanation.

55.     In the hours that followed, Defendants provided Plaintiffs no information about their actions. When Representative Plaintiff R.H.M. asked Defendant Norbal Vazquez whether Defendants were retaliating

against Plaintiffs because of their participation in the hunger strike, Defendant Vazquez smirked at him. Later that evening, GEO officers threatened Plaintiffs remaining in Dorm C that if they did not break their hunger strike, they would be forcibly transferred out of state and force-fed. ICE Officer Mo told R.H.M. that he should tell his attorneys to "drop the lawsuit" if Plaintiffs wanted to see any changes to their treatment.

56.     In response to these threats and shows of intimidation, the Plaintiffs in Mesa Verde Dorm C felt punished, terrorized, and afraid. Plaintiffs agreed to eat their meals that evening out of fear that if they did not, the events of that morning would repeat themselves the next day.

57.     ICE, under the ongoing supervision of the San Francisco Field Office, kept Individual Plaintiffs Guardado, Hernandez Gomez, Dominguez Vidal, and Figueroa-Padilla incommunicado for about 24 hours after forcibly removing them from Dorm C. For hours, their attorneys did not know where they were. It was not until about 1:00 p.m. that Individual Plaintiffs' attorneys, including three attorneys who reside in this district, received identical emails from ICE informing them that their clients were being transferred to an ICE detention facility in El Paso, Texas.

58.     Individual Plaintiffs were forced into a van, while ICE officials and GEO officers applauded. ICE officers, led by San Francisco ICE Assistant Field Office Director Starr, accompanied Individual Plaintiffs on a long van ride that was at turns humiliating, uncomfortable, and physically painful for Individual Plaintiffs. For example, the ICE officers used the air conditioning and heating systems to make the temperature inside the van alternately very cold and very hot, and made demeaning and frightening comments to the Individual Plaintiffs. Individual Plaintiffs did not know where they were being taken. Until they arrived at an airport, Individual Plaintiff Figueroa-Padilla believed they were being taken to the hospital. They were subjected to sexually abusive pat-downs, including invasive touching of their genitals. Upon arriving at the airport, Individual Plaintiff Hernandez Gomez spoke to San Francisco ICE Assistant Field Office Director Starr and told him what ICE was doing was "not right." San Francisco ICE Assistant Field Office Director Starr responded, "This is coming from higher up, I'm just following orders."

59.     Individual Plaintiffs endured a physically taxing flight to El Paso, where they landed in the evening, nearly 12 hours after their ordeal began. They were transported in vans operated by ICE which were driven so recklessly that Individual Plaintiffs hit their heads on the ceiling of the vehicle while en route to the

detention facility. They have been, and continue to be, detained at El Paso Service Processing Center, an ICE detention facility.

60.     The same day they arrived, medical staff at the El Paso facility told Individual Plaintiffs that they would be returned to Mesa Verde if they ate three meals in a row, but threatened them with solitary confinement and forced feeding if they did not eat. Individual Plaintiffs have agreed to pause their hunger strikes in hopes they will be returned to Mesa Verde. During their medical examination in El Paso, Individual Plaintiffs did not receive any medical care beyond what they had been provided in California. Individual Plaintiffs report that conditions in El Paso Service Processing Center are filthy, stressful, and uncomfortable. They have compared their experience to "torture."

61.     The El Paso medical staff's March 7 threats of forced feeding contradict representations from counsel for ICE to Plaintiffs' counsel on March 8 stating, "At this time ICE is not seeking a court order or orders that would allow force feeding any of the four individuals transferred to El Paso yesterday."

62.     Individual Plaintiffs do not believe their transfer was medically necessary. None of them had recently requested medical care or had consented to receive any medical procedures. Individual Plaintiff Guardado, for instance, had been drinking electrolytes and Ensure and taking vitamins at Mesa Verde to sustain his health during the hunger strike. None of the Individual Plaintiffs experienced acute medical needs—except as a result of their violent, painful, and stressful transfer process. But when, during the transfer, Individual Plaintiffs requested treatment for pain or nausea, ICE ignored them. When one Individual Plaintiff lost consciousness during the transfer, ICE ignored him for about five minutes and then medically "cleared" him without providing medical care or treatment.

63.     At least two Individual Plaintiffs have upcoming immigration court hearings in California, where their immigration counsels reside. Their transfers to Texas hamper their ability to communicate with their counsel to prepare for their immigration proceedings and may prejudice their claims for immigration relief. The sudden out-of-state transfers make it far more difficult for their immigration attorneys to be physically present at future merits hearings and to visit their clients in person to prepare sensitive aspects of testimony. Further, the transfers to Texas make it extremely difficult for witnesses and family members in California supporting the Individual Plaintiffs to appear or be present in court.

*Defendants Continue To Threaten And Intimidate Plaintiffs To Attempt To Persuade Them To End Their Hunger Strike*

64.     On the evening of March 7, following Individual Plaintiffs' forcible transfer from Mesa Verde, ICE Officer Mo told Plaintiffs in Mesa Verde Dorm C that the Individual Plaintiffs had been transferred and would be force-fed, and that remaining Plaintiffs in Dorm C could be transferred and force-fed, as well. Plaintiffs who heard these statements felt shocked and intimidated.

65.     On the evening of March 9, a doctor at Golden State visited hunger strikers and stated that if they continued their hunger strike beyond the next day, they would be transferred to an unspecified detention facility "elsewhere." The doctor confirmed that if they maintained their hunger strike, they would be transferred regardless of whether Plaintiffs displayed any medical distress.

66.     Defendants' retaliatory actions and statements would chill a person of ordinary firmness from continuing to engage in the protected activity of hunger striking. The timing of Defendants' actions, their stated opposition to and taunting statements about the hunger strike, and other evidence of Defendants' retaliatory motive establishes that they have taken these actions in direct reaction to the strike and are motivated by the desire to chill First Amendment-protected activity.

   i.     *The Timing of Defendants' Actions Suggests their Motive to Retaliate Against Plaintiffs' Expressive Conduct*

67.     First, Defendants' retaliatory actions began almost immediately after Plaintiffs declared they were going on a hunger strike to protest the conditions of their confinement and mistreatment.

68.     At Golden State, Defendants have been retaliating against Plaintiffs since the hunger strike began. Since the strike was declared, Defendants began attempting to verbally dissuade Plaintiffs from participating in the hunger strike, alternately cajoling and threatening them. On or about February 17, GEO staff threatened to place hunger strikers detained in Dorm A1 into the Special Management Unit's isolation cells so that they could "do [their] hunger strike there." Plaintiffs have reported being afraid to go to the medical unit for care because they fear they will be forcibly transferred to the SMU. GEO staff also began restricting the time that individuals in dorms housing hunger strikers are permitted to use tablets in their dorms, from all day to just four hours per day. Detained individuals rely on tablets to request medical attention and prescription medication, make commissary purchases, and have video calls with family. About one day after the hunger strike began, Defendants began making the dorms housing hunger strikers

uncomfortably cold. About two days after the hunger strike began, Defendants began ignoring maintenance requests from dorms housing hunger strikers, leaving toilets and showers unrepaired. Currently, the showers in at least two dorms housing hunger strikers are freezing cold, which Defendants have made no attempts to fix despite numerous requests. Further, the law librarian began shortening the amount of time that individuals in those dorms are allowed to conduct legal research for their immigration cases.

69.     Plaintiffs in Golden State have filed grievances with GEO and ICE regarding some of the conditions described above. Upon information and belief, Defendants have failed to meaningfully respond to any of them.

70.     Likewise, at Mesa Verde, Defendants have been retaliating against Plaintiffs since their hunger strike began. One day after the strike commenced, facility staff informed hunger strikers in Dorm C that the facility was canceling the dorm's weekly movie night, which otherwise took place every Friday or Saturday. Similarly, on or about February 18, Defendants indefinitely suspended access to church, the law library, the barbershop, and arts-and-crafts programming for Dorm C. Some of these programs have been restored since about March 1. Defendants also indefinitely suspended visitation with family and loved ones for everyone in Dorm C. As of March 6, those visits have not been restored. These activities and programming remain available to people housed in other dorms at Mesa Verde.

71.     Plaintiffs in Mesa Verde have filed grievances with GEO and ICE regarding the retaliatory conditions described above. Defendants have "rejected" or failed to meaningfully respond to virtually every grievance filed by Plaintiffs since the hunger strike has begun.

72.     Defendants' retaliatory actions serve no legitimate purpose, nor have Defendants articulated to Plaintiffs any purported justification for the adverse actions they have taken against the hunger strikers. Instead, Defendants' actions are intended to punish Plaintiffs for their participation in a protected activity.

### ii.     *Defendants Have Repeatedly Stated Their Opposition To Plaintiffs' Expressive Actions*

73.     Both GEO and ICE employees have expressed opposition to Plaintiffs' participation in the hunger strike and threatened or implied negative consequences if they continued their participation.

74.     On February 16, the evening before the hunger strike began, some Plaintiffs informed GEO staff at Mesa Verde of their intention to begin a hunger strike shortly. GEO staff threatened to send the "first

person" who declared a hunger strike to the RHU, a form of solitary confinement.

75.     Also on February 16, several hunger strikers detained at Golden State showed a GEO employee a grievance they were filing and declared they would be starting a hunger strike. The GEO employee became upset and threatened to put them in the "hole" (solitary confinement) and take away commissary if they went on hunger strike. On February 17, the first day of the hunger strike, an ICE employee told Representative Plaintiffs Guillermo Medina Reyes and E.O.A.R., as well as other Plaintiffs at Golden State, "You and your attorneys should do what you gotta do to get your money, but don't get burned," suggesting that detained individuals would ultimately pay a price for engaging in the hunger strike. The same ICE officer told Mr. Medina Reyes and E.O.A.R., "[The strike] is not going to go anywhere. You're wasting your time."

76.     GEO employees at Mesa Verde and Golden State have laughed at Plaintiffs, attempted to intimidate them into ending their strike, and taunted them with food, making comments like, "Doesn't that look good?" as they placed trays of food on the hunger strikers' beds. On or about February 18, GEO employee Sazu mocked members of the proposed class in Golden State by walking into the dorm and asking, "Has anyone gone home yet?", insinuating that the hunger strikers ought to give up. On or about February 19, GEO employee Anasola remarked to a group of hunger strikers in Golden State that they needed the strike because they needed to lose weight. On February 20, Representative Plaintiff E.O.A.R. heard a GEO employee at Golden State make fun of the hunger strikers' efforts by referencing a prior hunger strike at the facility which had lasted for three days and claiming they, too, would "fail," because "you guys don't even know how to do a hunger strike right." On or about February 21, E.O.A.R. heard a different GEO employee express disgust at the hunger strikers, saying, "You guys should have thought about this before coming here illegally."

77.     On or about February 21, ICE officers visited several dorms at Golden State housing members of the proposed class. They announced that they would search their dorms for any hidden food and return the following week to conduct another search.

78.     Also on or about February 21, Defendant San Francisco ICE Field Office Director Moises Becerra, who is based in San Francisco, California, traveled to visit members of the proposed class detained

at Golden State. Defendant San Francisco ICE Field Office Director Becerra asked Plaintiffs why they were engaging in a hunger strike. Plaintiffs explained that through the hunger strike, they were expressing their desire for a fair opportunity to be individually considered for release from custody, as opposed to receiving automatic or blanket denials. Defendant Becerra responded that ICE has no control over releases, "so to be honest you guys are wasting your time." Defendant Becerra told Plaintiffs that if they wanted release they would have to talk to their attorneys and "get them to do their job." Plaintiffs felt that Defendant Becerra's words signaled his frustration with the hunger strike and were an explicit attempt to convince them to end the strike.

79. Defendants have further expressed their opposition to Plaintiffs' peaceful protest by threatening and applying negative consequences. For example, until recently, Defendants indefinitely denied access to all commissary items to individuals housed in Mesa Verde Dorm C, including essential non-food items such as soap, shampoo, toothpaste, floss, mouthwash, and batteries—restoring limited access to commissary only after this action was filed. Before that limited access was restored, facility staff told Plaintiffs in Dorm C that, on or around March 1, Facility Administrator Vazquez had issued an order that they were indefinitely forbidden from ordering anything from commissary, including essential hygiene products. Further, various GEO employees explicitly told Plaintiffs in Dorm C that ICE had ordered them to suspend yard, recreational opportunities, and visitation for their dorm because of their participation in the hunger strike.

80. On or about February 24, two ICE officers based in San Francisco—San Francisco ICE Deputy Field Office Director Richard Chang and Officer Rodriguez—traveled to Mesa Verde and verbally urged Plaintiffs to cease their hunger strike.

81. Also on or about February 24, Defendant Becerra, traveled from his base in San Francisco to Golden State Annex, also to verbally urge Plaintiffs to cease their hunger strike.

82. On or about March 3, GEO officers told Plaintiffs in Mesa Verde that the restrictions they were experiencing—on information and belief including visitation, law library, commissary, and recreation and programming—would "end" if Plaintiffs ended their strike.

83.     On March 7—the evening after the ICE-led raid resulting in the transfer of Individual Plaintiffs from Mesa Verde—ICE Officer Mo told Plaintiffs, including Representative Plaintiff R.H.M., that if they "drop[ped] the lawsuit," then ICE and the Plaintiffs could "work something out." ICE Officer Mo further told Plaintiffs that if they did not begin eating, they would be forcibly transferred and force fed. These threats created feelings of fear, intimidation, and defeat in the hunger strikers' minds.

84.     On March 8 and 9, ICE Officer Brinker, based in the San Francisco ICE Field Office, traveled to Golden State and attempted to persuade Plaintiffs to end their hunger strike.

85.     ICE and GEO's express and repeated opposition to Plaintiffs' participation in protected activity, and threats of punishment if they persist, is consistent with Defendants' past practice of engaging in retaliatory discipline against detained individuals for acting collectively, standing up for their rights, using the grievance procedures available to them, and filing litigation to contest unlawful labor conditions at Mesa Verde and Golden State. *See supra* ¶¶ 32–39.

### iii.     There Is Ample Other Evidence Of Defendants' Retaliatory Motive

86.     Defendants have engaged in conduct to manipulate and intimidate the hunger strikers to influence or limit their participation in the hunger strike protest.

87.     Soon after Plaintiffs declared the beginning of the hunger strike, nurses at Mesa Verde, including Nurse Ford, entered Dorm C and asked hunger strikers to sign a document written in English and authorizing the facility to administer involuntary medical treatment, without explaining to hunger strikers what was contained in the document. Several Plaintiffs in Dorm C do not understand written English. One hunger striker, who lacks the ability to read or write in any language, signed the document without understanding its contents because Nurse Ford presented him the document and instructed him to sign it. When Representative Plaintiffs Milton Mendez and R.H.M. became aware of the contents of the document, they began to review it with other Plaintiffs to help them make an informed choice about whether to sign it. When GEO employees saw Mr. Mendez and R.H.M. were reviewing the document with other hunger strikers, they threatened to conduct a full search of the dorm to confiscate any copies of the document that remained. GEO employees claimed that only people who had signed the document were entitled to look at it.

88.     From about February 16 to about March 1, medical staff at Mesa Verde refused to provide medical treatment to the proposed class or check their vital signs—despite being required by ICE policy to do so—unless the hunger strikers agreed to leave Dorm C and go to a separate medical unit or the RHU. Plaintiffs expressed fear that if they left Dorm C, Defendants would forcibly place them in solitary confinement. Although Plaintiffs expressly consented to waive their privacy rights and repeatedly requested that medical staff check their vital signs inside the dorm—something Defendants at Mesa Verde have done during previous times of emergency, including the beginning of the COVID-19 pandemic—Defendants instead conditioned Plaintiffs' access to medical care on their agreement to leave Dorm C. If a Plaintiff did not agree to leave Dorm C for this purpose, they were marked as "refusing" medical attention. It was not until about March 1, a week after this lawsuit was filed, that medical staff began allowing Plaintiffs to receive medical care inside the dorm.

89.     The experience of one putative class member illustrates the validity of Plaintiffs' fear about leaving Dorm C. On February 22, a hunger striker at Mesa Verde who was previously diagnosed with diabetes requested that medical staff check his vital signs. He also requested that the medical staff provide him with Ensure, a high-protein drink, to help sustain his health during the hunger strike. The medical staff stated they would only agree if he left Dorm C and went to the main medical office. When the proposed class member did so, GEO staff told him that if he wanted Ensure, they would take him to medical isolation, and attempted to place handcuffs on his wrists. The proposed class member was forced to lie down on the floor to avoid being placed into medical isolation. After about twenty minutes, he was finally returned to Dorm C without receiving Ensure.

90.     As the hunger strike continued, GEO staff began selectively targeting Plaintiffs with threats of discipline and displayed increasing contempt for them. For example, on February 22, at Golden State, GEO employee Sazu threatened to "write up" Representative Plaintiff Cruz Martinez Leiva for an unspecified violation after Mr. Martinez Leiva asked another proposed class member to press on his back where he was experiencing a muscle spasm. Mr. Martinez Leiva had never previously been disciplined for such innocuous conduct. Also on February 22, at Mesa Verde, Facility Administrator Vazquez gave a speech to Dorm C in which he repeatedly told the proposed class members that they were "prisoners" and "property of ICE." As

Facility Administrator Vazquez spoke these words, Chief of Security Shawn Beeman, who was also present, laughed.

91.     Additionally, GEO staff have also attempted to deny at least one hunger striking Plaintiff access to his attorney. A full week in advance, the attorney—whose office is based in this district—made a request to visit her client in person at Mesa Verde. GEO staff ignored the request. When she inquired, GEO staff claimed that ICE needed to approve the request. When the attorney followed up with ICE, they told her in writing, "ICE does not approve the attorney visits." When the attorney confronted GEO staff about this, they changed their explanation, stating, "It has to be sent up to our corporate officer for review and approval." They approved her visit only a few hours in advance, and allowed her only 1 hour instead of her requested 2 hours. When she arrived, she found no other legal rooms were in use to justify the limitation.

**C.     ICE Leadership Based In San Francisco, California Have Worked In Concert With GEO Employees To Retaliate Against Hunger Strikers In Mesa Verde and Golden State**

92.     Defendants have been acting in concert to mount the campaign of retaliation described above against Plaintiffs. ICE defendants based in the San Francisco ICE Field Office have engaged in unconstitutional retaliation in coordination with, and with the cooperation and assistance of, GEO defendants in the facilities. ICE defendants based in the San Francisco ICE Field Office are aware of, and acquiesce in, GEO defendants' retaliatory actions against Plaintiffs. Further, the San Francisco ICE Field Office has exclusive authority over (1) transfers to and from Mesa Verde and Golden State, (2) the decision to seek forced feeding for people in custody at Mesa Verde and Golden State and, (3) the process of seeking a court order to permit forced feeding.

93.     ICE policy requires that the Field Office Director—in the case of Mesa Verde and Golden State, the San Francisco ICE Field Office Director—be notified "immediately" when anyone in ICE custody is on a hunger strike,[7] and that contractors like GEO maintain a detailed record of all interactions with the person on strike and all communications regarding the strike between GEO and ICE Field Office personnel.[8] In combination with the sustained retaliation that Plaintiffs have experienced from GEO employees since the hunger strike began, these policies make clear that ongoing retaliation at Mesa Verde and Golden State must

---

[7] ICE 2011 Performance Based National Detention Standards ("PBNDS") § 4.2(II)(2), p. 255.
[8] *Id.* at § 4.2(II)(8), p. 255.

FIRST AMENDED CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. 3:23-cv-00829-TLT

be taking place with the San Francisco ICE Field Office's knowledge and approval.

94.    Moreover, in just the last three weeks, ICE officials based in San Francisco have traveled to Mesa Verde and Golden State at least five times with the explicit purpose of attempting to discourage Plaintiffs from continuing their peaceful, expressive hunger strike. *See supra* ¶¶ 77, 78, 80, 81, 84.

95.    Further, since armed ICE officers with "San Francisco Special Force Response Team" badges forcibly transferred Individual Plaintiffs on March 7, ICE and GEO officers have made remarks to Plaintiffs indicating that ICE leadership in San Francisco planned, coordinated, and ordered the retaliation Mesa Verde and Golden State. For example, San Francisco ICE Assistant Field Office Director Manuel Starr told Individual Plaintiff Hernandez Gomez, "This is coming from higher up, I'm just following orders."  In response to a Plaintiff who stated his opinion that GEO's retaliatory tactics were undertaken with "the support of ICE," GEO Lieutenant Harrison responded, "I agree."

96.    ICE's San Francisco Field Office has exclusive responsibility for determining where individuals within the San Francisco Area of Responsibility—encompassing Mesa Verde and Golden State, among other facilities—are detained, and is responsible for approving any transfers to other facilities. Specifically, "[d]ecisions to transfer detainees are made by the Field Office Director"—here, San Francisco ICE Field Office Director Becerra—"or his/her designee."[9] The San Francisco ICE Field Office Director also has exclusive responsibility to initiate the process of requesting forced feeding of people on hunger strike in custody at Mesa Verde and Golden State, which various officials have already threatened.[10]

97.    ICE's San Francisco Field Office is directly responsible for Defendants' pattern of deploying disciplinary processes in retaliation for First Amendment-protected activity. According to ICE policy, the San Francisco ICE Field Office Director was required to review all of the disciplinary actions described above.[11] Moreover, ICE policy expressly calls for disciplinary action against detained individuals for

---

[9] *Id.* at §§ 7.4(II)(1), p. 457; 7.4(V)(A)(1), p. 458; *see also* ICE Transfers Policy No. 11022.1 (Jan. 4, 2012), *available at* https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf (noting that transfers where a person has immediate family in the Area of Responsibility ("AOR"), an attorney of record within the AOR, pending or ongoing removal proceedings in the AOR, or has been granted bond or ha a scheduled bond hearing, "will not [be] transfer[red]" without "approv[al] at the Assistant Field Office Director level or higher," and only if a Field Office Director "or his or her designee" deems such a transfer "necessary."

[10] PBNDS § 4.2(V)(E)(1)(a)–(b), p. 256.

[11] *Id.* § 3.1(V)(A)(5), p. 216.

FIRST AMENDED CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. 3:23-cv-00829-TLT

"[e]ngaging in or inciting a group demonstration," without regard to whether the activity is protected by the First Amendment (the "Group Demonstration Policy").[12] In July 2022, two Plaintiffs were found to have violated the Group Demonstration Policy for exercising First Amendment-protected rights, including using the facility's grievance process to complain of mistreatment. Both were punished with solitary confinement in the RHU.

## **CLASS ALLEGATIONS**

98.     Representative Plaintiffs seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of: All individuals detained by ICE at the Mesa Verde and Golden State Annex facilities who have declared, or will declare, that they are on hunger strike.

99.     The proposed class satisfies Rule 23(a)(1) because it so numerous that joinder of all members is impracticable. Approximately 82 individuals have participated or are currently participating in the hunger strike at Mesa Verde and Golden State and thus fall within the class definition. More individuals may join the hunger strike and will therefore fall within the class.

100.    Joinder is also impracticable because proposed class members are detained and many are indigent, lack counsel, and/or have limited English proficiency, making it exceedingly difficult for them to bring individual litigation against Defendants.

101.    The proposed class satisfies Fed. R. Civ. P. 23(a)(2) because there are questions of law or fact common to the class, the answers to which will drive the resolution of the litigation. These questions include which legal standard applies to First Amendment retaliation claims brought by individuals detained in civil immigration custody, and whether Defendants have a pattern, practice, and/or policy of retaliating against individuals at Mesa Verde and Golden State who are peaceably exercising their First Amendment rights.

102.    The proposed class satisfies Fed. R. Civ. P. 23(a)(3) because the claims of the proposed class representatives are typical of the claims of the class. Each proposed class representative, like the rest of the class, is subject to Defendants' pattern, practice, and policy of retaliating against hunger strikers peaceably exercising their First Amendment rights. Each seeks similar relief as the rest of the class.

103.    The proposed class satisfies Fed. R. Civ. P. 23(a)(4) because the proposed class

---

[12] *Id.* § 3.1 Appendix 3.1.A, p. 225

FIRST AMENDED CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. 3:23-cv-00829-TLT

representatives have committed to fairly and adequately protecting the interests of the class, and are aware of no conflicts that would preclude fair and adequate representation.

104.    In addition, proposed class counsel are highly qualified to serve as class counsel and collectively have extensive experience litigating class actions, immigration detention cases, and First Amendment issues.

105.    Finally, the proposed class satisfies Fed. R. Civ. P. 23(b)(2). Defendants have acted on grounds generally applicable to the class by carrying out a pattern, practice, and policy of retaliating against individuals in their custody who participate in peaceful collective action, including the current hunger strike. This pattern, practice, and policy is reflected in ICE's Group Demonstration Policy, which purports to authorize disciplinary action for participating in peaceful collective action, and in Defendants' lengthy history of retaliating and condoning retaliation in response to peaceful collective action. Injunctive and declaratory relief is appropriate on a class-wide basis.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

106.    A justiciable controversy exists between Plaintiffs and Defendants.

107.    Plaintiffs will suffer irreparable injury if Defendants continue to retaliate against them in violation of the First Amendment.

108.    Plaintiffs have no adequate remedy at law.

## CLAIM FOR RELIEF

### First Amendment Of The United States Constitution—Unlawful Retaliation

109.    The foregoing allegations are realleged and incorporated herein.

110.    The First Amendment to the U.S. Constitution protects "the freedom of speech . . . and to petition the Government for a redress of grievances." U.S. Const. amend. I. This constitutional protection applies to individuals in civil immigration detention.

111.    Defendants' actions of retaliation against Plaintiffs for their peaceful expression and protest— including threatening, intimidating, and taunting Plaintiffs; engaging in a coordinated campaign to discourage Plaintiffs from continuing their peaceful, expressive hunger strike; and, on March 7, violently transferring Individual Plaintiffs—violate Plaintiffs' rights under the First Amendment.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs respectfully ask this Court to take jurisdiction over this actual controversy and grant the following relief:

1.    Certify the class described above, *supra* ¶ 98;

2.    Declare that the actions and practices of Defendants as described above constitute violations of the First Amendment to the U.S. Constitution;

3.    Enjoin Defendants U.S. Immigration and Customs Enforcement, Tae Johnson, and Moises Becerra, the GEO Group, Inc., Norbal Vazquez, Minga Wofford, and their officers, employees, agents, and any persons acting in concert with them, from:

    a.    Transferring or threatening to transfer or authorizing or directing the transfer of Plaintiffs to different detention facilities in retaliation for their participation in the hunger strike;

    b.    Continuing to detain Individual Plaintiffs Pedro Figueroa-Padilla, Jose Ruben Hernandez, Raymundo Noe Dominguez Vidal, and Roberto Carlos Franco Guardado in a facility other than the Mesa Verde ICE Processing Center, where their transfer out of the Mesa Verde ICE Processing Center was effectuated in retaliation for their participation in the hunger strike;

    c.    Force-feeding or attempting to force-feed Plaintiffs without at least 24 hours' notice to Plaintiffs' counsel and to this Court; and

    d.    Otherwise engaging in or authorizing any further retaliation for Plaintiffs' exercise of protected First Amendment activity through their hunger strike;

4.    Enjoin all Defendants and their officers, employees, agents, and any persons acting in concert with them, from:

    a.    Using violence, excessive physical force, or sexually-abusive pat downs against Plaintiffs;

    b.    Denying Plaintiffs access to their attorneys; and

    c.    Otherwise engaging in any further retaliation for Plaintiffs' exercise of protected First Amendment activity through their hunger strike;

5.    Award Plaintiffs reasonable attorneys' fees, costs, and other disbursements in this action permitted under the Equal Access to Justice Act, *as amended*, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

6.    Grant all other relief that this Court deems just and proper.


Respectfully submitted,

Dated: March 10, 2023

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

/s/ *Michelle (Minju) Y. Cho*
Michelle (Minju) Y. Cho

*Attorneys for Plaintiffs*